[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The plaintiff brings this tax appeal challenging the assessor's determination of the value of the plaintiff's real estate located a 2 Shaw's Cove in New London as of October 1, 1988.
On October 1, 1988, the City of New London ("City") placed a fair market value on the subject property of $2,960,100. The subject property is a two-story commercial office building located in a six building office park known as Shaw's Cove in New London. The office building contains 30,900 square feet of space and sits on 2.58 acres of land. Shaw's Cove is one of the most CT Page 5047 desirable office parks located in southeastern Connecticut. The office park is a premier area with all utilities, granite curbs, sidewalks, full sprinkler system, and natural gas heating. The subject property was constructed in 1985. At the time of the city-wide revaluation on October 1, 1988, the subject property was three years old and fully occupied by tenants.
Both the plaintiff's appraiser, F. Jerome Silverstein, and the defendant's appraiser, Stephen R. Flanagan, were of the opinion that the highest and best use of the subject property was its continued use as an office building. We concur. After determining the highest and best use of the subject property, both appraisers relied on the income approach as the best method of valuing the property.
The actual income to the subject property for the year 1988 was $479,026, reflecting income from a 100% occupancy rate. The owner of the subject property paid the common area maintenance expenses up to $4 per square foot. The lessees of the subject property were required to pay the common area maintenance expenses that exceeded $4 per square foot. The actual operating expenses of the subject property in 1988 were $125,759, plus $23,081 for property taxes, for a total of $148,840.
Silverstein was of the opinion that the fair market value of the subject building was $2,065,000, using the income approach to value. (See Plaintiff's exhibit A.) Silverstein used the actual income of the subject property for the year 1988, which was $479,026. However, in computing the operating expenses of the subject, Silverstein disregarded the actual operating expenses of $125,759, excluding taxes, and arrived at his own determination of $158,173 for operating expenses. Silverstein set up a reserve of $15,000 for the replacement of a new furnace, air carpeting and a new roof. Silverstein also deducted a vacancy allowance of $17,860. This was on top of taking a vacancy allowance of 12% of gross income, or $57,483. We note that in Silverstein's table of operating expenses, electricity was listed as $37,816, or almost 24% of the operating expenses. (See Plaintiff's exhibit A). This appears to be unreasonably high given our finding that the subject property was heated by gas, not electricity, and that the common area maintenance obligation of the owner was limited to $4 per square foot. Silverstein was of the opinion that on October 1, 1988, the real estate market was in a decline; therefore, the expiration of short term leases at the subject property raised the need for a higher vacancy CT Page 5048 factor as well as reduced the estimate of future income. We disagree with Silverstein's analysis of vacancy rates, reserve allowances and market conditions.
The defendant's appraiser, Flanagan, was of the opinion that, in 1988, the real estate market for office rentals was improving. With the real estate market in 1988 becoming stronger, short term leases benefit the owners of office space since new leases can be expected to bring in higher rents. We find this analysis credible.
In his original appraisal report (Defendant's exhibit 2), Flanagan did a market analysis of rents during 1987 and concluded that, as of the date of the appraisal, the market supported a net rental rate of $14 to $15 per square foot. Flanagan noted that 1985-86 rental date provided to the assessor by the former owner showed that the actual rental rate at the subject property for that period averaged $14.85 per square foot. Flanagan selected $14 per square foot as the appropriate net rental rate. Flanagan reduced the 30,900 square feet of space to 30,542 square feet of gross rentable space and deducted a 5% vacancy/collection loss to arrive at a gross income of $406,209. From the potential gross income of $406,209, Flanagan deducted a net operating expense of $83,648. The net operating expense used by Flanagan included a 5% management expense compared to the management expense used by Silverstein of 15.6%. Using the discount cash flow approach to finding value, Flanagan arrived at a fair market value of $3,226,000 based on an effective gross income of $406,209, a net operating expense of $83,648, a net operating income of $322,561 and a discount rate of 10%.
In a letter dated May 12, 1998, Flanagan presented the city with a value analysis based upon the actual 1988 income and expense figures provided to him by the city after the completion of his original appraisal report. (See Defendant's exhibit 1.) Flanagan's analysis of the actual income and expense figures for the subject property in 1988 reflect a comparable relationship to the market in 1988. The actual income of the subject property in 1988 was $479,026. The operating expenses for 1988 were $148,840, including real estate taxes of $23,081 based upon a seven year Enterprise Zone abatement program. Excluding taxes and adding $6,180 for a replacement reserve, Flanagan arrived at a net operating expense of $131,939. This resulted in a net operating income of $347,087. Using a capitalization rate of 11.50%, which included 1.5% for property taxes, Flanagan arrived at a fair CT Page 5049 market value of $3,018,000 as of October 1, 1988, based upon the actual 1988 income and expense data for the subject property.
When considering the valuation of rental income property, we have to keep in mind that both market rent and actual rental income should be considered. First Bethel Associates v. Bethel.231 Conn. 731, 739-741, 651 A.2d 1279 (1995). Flanagan's analysis takes into consideration both market rental income and contractual rental income.
We have weighed the opinions of Silverstein and Flanagan, including their analysis of income and expense figures and market conditions. We find Flanagan's analysis of value of the subject property as of October 1, 1988, using market and actual income and expenses to be more credible than Silverstein's analysis.Carol Management Corp. v. Board of Tax Review, 228 Conn. 23, 41,633 A.2d 1368 (1993). Since Flanagan's finding of value is slightly higher than the city's valuation of $2,960,100, we conclude that the plaintiff has not sustained its burden of showing that the city's assessment of the subject property as of October 1, 1988 was excessive. Birchwood Country Club. Inc. v.Board of Tax Review, 178 Conn. 295, 301, 422 A.2d 304 (1979).
Accordingly, judgment may enter in favor of the defendant without costs to either party.
Arnold W. Aronson Judge Trial Referee